13:04:28

1           UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - X

5    UNITED STATES OF AMERICA      )       22CR6009

6    vs.
                                   Rochester, New York
7    JOHN DOUGLAS LOONEY,
                               )       May 8, 2023
8            Defendant.              1:00 p.m.
     - - - - - - - - - - - - - - X

9    **ORAL ARGUMENT**

10

11              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE MARK W. PEDERSEN
12         UNITED STATES MAGISTRATE JUDGE

13           JAMES P. KENNEDY, JR., ESQ.
             United States Attorney
             BY:  MEGHAN MCGUIRE, ESQ.
14           Assistant United States Attorney
             100 State Street
15           Rochester, New York 14614

16
             JAMES A. NAPIER, ESQ.
17           Napier & Napier
             16 West Main Street, Suite 700
18           Rochester, NY 14614

19

20

21

22

23   **COURT REPORTER: Karen J. Clark, Official Court Reporter**
                **Karenclark1013@AOL.com**
24             **100 State Street**
               **Rochester, New York 14614**

25

```
 1                    USA V. J. LOONEY

 2              P R O C E E D I N G
                 *              *              *
 3

 4

 5              THE CLERK:  We're on the record, this is

 6    case No. 22CR6009, United States versus John Douglas

 7    Looney.

 8              MAGISTRATE JUDGE PEDERSEN:  Sir, you are

 9    John Looney?

10              THE DEFENDANT:  Yes.

11              MAGISTRATE JUDGE PEDERSEN:  You're appearing

12    here with your attorney, Mr. Napier?

13              THE DEFENDANT:  Yes.

14              MAGISTRATE JUDGE PEDERSEN:  This was

15    originally scheduled for an evidentiary hearing, but I

16    think we're going to go with an oral argument instead.

17              Is that your understanding, Ms. McGuire?

18              MS. MCGUIRE:  That was my understanding.

19              MAGISTRATE JUDGE PEDERSEN:  And Mr. Napier?

20              MR. NAPIER:  That is my understanding as

21    well, your Honor.

22              MAGISTRATE JUDGE PEDERSEN:  It seems we have

23    a difference of opinion on how Freenet works between Mr.

24    Levine's theory and the theories that you brought forth,

25    Mr. Napier.  One is that it has an even-share model,
```

The timestamps in the left margin read:
13:06:40 (line 5), 13:06:41 (line 6), 13:06:48 (line 7), 13:06:49 (line 8), 13:06:52 (line 9), 13:06:54 (line 10), 13:06:54 (line 11), 13:06:55 (line 12), 13:06:57 (line 13), 13:06:58 (line 14), 13:06:59 (line 15), 13:07:05 (line 16), 13:07:08 (line 17), 13:07:10 (line 18), 13:07:12 (line 19), 13:07:13 (line 20), 13:07:18 (line 21), 13:07:22 (line 22), 13:07:23 (line 23), 13:07:30 (line 24), 13:07:35 (line 25)

                              USA V. J. LOONEY

13:07:42   2    meaning that a requester machine sends out an even

13:07:48   3    amount of requests, roughly even, to all of its peers.

13:07:52   4    And then the other is that it favors one or the other

13:07:58   5    peer.  And then there is also the friend of a friend

13:08:01   6    sharing that further fragments the request.

13:08:07   7              So, Mr. Napier, why don't I have you explain

13:08:11   8    first why you believe that Freenet is not operating the

13:08:15   9    way that Mr. Levine posited in his paper.

13:08:21   10             MR. NAPIER:  Okay, your Honor.  I submit,

13:08:24   11   Judge, that there is no one besides the government in

13:08:30   12   its affidavit is maintaining, and by no one I mean not

13:08:35   13   the Freenet developers, not other academic papers that

13:08:40   14   are peer reviewed, I believe, that requests for bits of

13:08:46   15   a file on Freenet are distributed roughly evenly or by

13:08:52   16   even share.  As my last written submission to you

13:08:57   17   indicated, your Honor, the Freenet developers in their

13:09:01   18   August -- in an August 2022 article, stated that

13:09:06   19   everything about the Levine approach was wrong.  And I

13:09:12   20   don't think it's an exaggeration, as far as that article

13:09:16   21   is concerned, that everything that they maintain the

13:09:19   22   developers of the Freenet network maintain that

13:09:22   23   everything regarding the Levine method is wrong.  I'll

13:09:28   24   just quote a little bit of that article.  It was written

13:09:32   25   in August of '22, "In April of 2020" -- this is a quote

USA V. J. LOONEY

-- "In April of 2020, the approach by Levine to track down loaders," which is the fundamental issue as to this case, "was proven to be wrong.  Their false positive rates is wrong.  Their math is wrong and their model is wrong.  Therefore, the results you get when using their method are false.  Yet this approach is still used two years later to get warrants against Freenet users."

Quite frankly, your Honor, that is, as I say, there has been other academic papers that we've submitted that says Freenet does not distribute their request in a roughly even way.

I submitted a case, your Honor, and I concede there is some confusion as to where this case came from, so-called New York City case.  But I do think it's important.  We had a -- we have a warrant for a computer in connection with this case.  It's *United States v. James Corbett*, C-o-r-b-e-t-t.  And it was out of the Southern District of New York.  And we compared the warrant with the IP, the warrant in the IP address, and, excuse me, and the chart, if you will, that I have, and as it was included as one of the exhibits.  And what that shows, Judge, is that, in that particular case, as far as the files of interest that the suspected downloader had requested, bits of that file to law

1                    USA V. J. LOONEY

2   enforcement -- and I'm going to go through each of these

3   files, if I may, because I think it proves each of the

4   points.  Where there was requested by the FBI in the

5   first file of interest from this chart -- sorry --

6                    MAGISTRATE JUDGE PEDERSEN:  Is this the case

7   that you gave me a copy of warrant 20MAH669?

8                    MR. NAPIER:  I'm sorry, your Honor.  So,

9   again, in that particular case, we ran one file of

10  interest.  There was four law enforcement nodes, FBI

11  nodes, that were connected, directly connected to the

12  suspected downloader.  And it indicated in the charge

13  that the expected number of requests on the first file

14  of interest were 27, 28, 27, 27.  And the requests

15  received by the four different respective law

16  enforcement nodes were 29, 11, 10 and 17.

17          In this particular case, all we've been

18  given information, in the Looney case, all we've been

19  given information about is one FBI node connected to Mr.

20  Looney's computer.  We don't know if there was other FBI

21  nodes connected to Mr. Looney's computer.  And,

22  therefore, we don't know if the number of requests

23  received would have been different and not roughly

24  evenly to any other FBI nodes as it was in this New York

25  City *James Corbett* case.  So, that is the first file of

USA V. J. LOONEY

interest, the request received from the four respective

different FBI nodes, but all connected to the suspected

downloaders were 29, 11, 10 and 17.

Regarding the next file of interest, the

expected number request under this even-share method was

50.  And the request received were 42 and 4.  And,

again, from two different respective FBI connected

nodes.  Obviously, your Honor, I'm not a math genius,

but 42 and 4 are not roughly even.

And the last file of interest where it was

expected number of request was 24, the four law

enforcement nodes received request from the suspected

downloader of 25, 12, 5, and 19.  So, your Honor, I

think that that is pretty clear evidence that requests

to a connected node are not distributed roughly evenly.

And Dr. Brian Levine, who, I submit, is not

even though it is not directly referred to in the

affidavit, was the creator of the formula or the method

that was used to determine who a downloader is and the

even-share methodology, he concedes that actually

routing requests are done by what is called a

friend-of-a-friend routing.  And the key point of

friend-of-a-friend routing, which we believe the

evidence is overwhelming that that is actually how

                    USA V. J. LOONEY

13:16:02  2  requests of bits of a file on Freenet are requested is

13:16:07  3  that friend-of-a-friend routing does not allow for an

13:16:09  4  expected number of bits of a file to be received if one

13:16:14  5  is the downloader, and, therefore, it can provide no

13:16:19  6  probable cause to believe that this person is, in fact,

13:16:22  7  the downloader.

13:16:25  8          I, briefly, your Honor, I know your Honor

13:16:28  9  has been given a lot of material on these issues, but

13:16:33  10  I'd appreciate the Court's indulgence by reading a bit

13:16:38  11  more on friend-of-a-friend routing.

13:16:42  12          Freenet, we submit to you, Judge, that

13:16:46  13  Freenet uses FOAF, friend-of-a-friend routing, and some

13:16:53  14  of this has been submitted, but it's important for my

13:16:56  15  argument, if I may.  Freenet uses FOAF,

13:17:00  16  friend-of-a-friend routing, where an FOAF node is simply

13:17:02  17  a peer of a peer of a peer of a node.  It's simply

13:17:06  18  wording, it's not to imply that the actual user knows

13:17:10  19  the FOAF.  In reality, every request has an inherent

13:17:16  20  ideal location, not geographic, which it is routed for.

13:17:18  21  Nodes route requests by giving them to the peer whose

13:17:22  22  location is closest to that ideal location.  The

13:17:25  23  location is a number between zero point zero and one

13:17:28  24  point zero calculated from the hash value.

13:17:31  25          I think I've submitted, as far as how

USA V. J. LOONEY

13:17:33 Freenet works, more detailed information regarding
13:17:37 friend-of-a-friend routing, but what we're asking for at
13:17:40 the end of the day, at the end of the argument is for an
13:17:43 evidentiary hearing, which Officer Turner would be
13:17:47 required to testify to explore these issues.  Again, the
13:17:54 key part being that we do not believe, and more
13:17:58 important than we, as in John and I, the Freenet
13:18:02 developers, the academic papers, Dr. Brian Levine,
13:18:07 himself, when he refers to routing is done by way of
13:18:10 friend of a friend, and we believe that the proof is
13:18:16 very strong, if not overwhelming, that it cannot be
13:18:22 determined through friend-of-a-friend routing who the
13:18:25 downloader is of a particular file.  It can be
13:18:28 determined through even share if that was the
13:18:31 methodology that was used by Freenet.  But, Judge, I can
13:18:38 go so far as to say that I believe it's conclusive that
13:18:42 Freenet does not use even share or roughly distributed,
13:18:48 requests being roughly distributed evenly.

13:18:52           So, Judge, to answer your question, at this
13:18:55 time, as far as a why do we believe that requests are
13:19:00 not distributed roughly evenly, it's Dr. Levine himself
13:19:05 refers to requests being distributed by way of friend of
13:19:10 a friend.  That the New York City case shows wildly
13:19:10 dispirit number of requests received by the FBI from the

```
              1               USA V. J. LOONEY
13:19:23      2    same suspected connected node.  There is no intermediary
13:19:27      3    node between the suspected node and the FBI in those
13:19:29      4    cases.  In other words, they all should have received
13:19:32      5    roughly the same amount of requests and they did not.
13:19:34      6    And for those reasons, your Honor, we believe that the
13:19:38      7    proof is very strong that requests are not distributed
13:19:45      8    by even share and are, in fact, distributed by friend of
13:19:53      9    a friend, which does not allow for a determination as to
13:19:56     10    an expected number of requests which could be used to
13:20:00     11    determine probable cause.
13:20:01     12               MAGISTRATE JUDGE PEDERSEN:  Is this case
13:20:04     13    that we're in here --
13:20:05     14               MR. NAPIER:  Yes.
13:20:05     15               MAGISTRATE JUDGE PEDERSEN:  -- also an open
13:20:07     16    net case or is it a dark net, I think was the term?
13:20:12     17               MS. MCGUIRE:  Open net, your Honor.
13:20:13     18               MR. NAPIER:  I believe it is an open net.
13:20:16     19    This case, the Looney case, your Honor.
13:20:19     20               MAGISTRATE JUDGE PEDERSEN:  Yes.
13:20:19     21               MR. NAPIER:  That is an open net case, your
13:20:21     22    Honor.
13:20:21     23               MAGISTRATE JUDGE PEDERSEN:  The same is true
13:20:22     24    of the New York City case that you presented?
13:20:24     25               MS. MCGUIRE:  Yes, your Honor.
```

```
                            USA V. J. LOONEY
```

1                          USA V. J. LOONEY

13:20:25  2          MAGISTRATE JUDGE PEDERSEN:  Thank you.

13:20:27  3          Ms. McGuire.

13:20:28  4          MS. MCGUIRE:  Your Honor, just to touch on

13:20:29  5   the New York City case.  I'm not really sure what the

13:20:33  6   source of this printout is, but assuming it's accurate

13:20:36  7   and unaltered, I would point out that in that warrant,

13:20:41  8   the Levine method was used to obtain a warrant based on

13:20:46  9   probable cause to search the devices at that location.

13:20:49  10  The resulting case is *U.S. v. Corbett*, 20CR525.  Child

13:20:55  11  pornography was found at that home, and that defendant

13:20:58  12  subsequently pled guilty to possession of child

13:21:01  13  pornography.  So, what that case shows is that another

13:21:05  14  instance in which the use of this formula to predict who

13:21:10  15  is requesting downloads of child pornography worked.

13:21:13  16  There is nothing in the defendant's submissions or in

13:21:15  17  anything I'm aware of and certainly nothing that Officer

13:21:19  18  Turner was aware of before he signed the application

13:21:21  19  that shows that this formula does not work.  And I think

13:21:24  20  the fundamental thing where we're talking past each

13:21:28  21  other here is the difference between theory and

13:21:30  22  application.  The Freenet developers developed a system

13:21:35  23  where they were attempting to come up with a very

13:21:38  24  complicated routing system for requests.  The resulting

13:21:42  25  network, Freenet, operates differently in practice than

```
                              USA V. J. LOONEY

13:21:46   2   what they had hoped and intended.  And that is what Dr.
13:21:50   3   Levine studied.  How it actually works in practice, not
13:21:54   4   in theory.  And what he found in practice is that if you
13:21:58   5   model it as roughly even distribution, you can
13:22:02   6   accurately predict whether or not someone is requesting
13:22:06   7   a file to download.  So there is nothing in anything
13:22:09   8   that the defense has submitted that suggests, first,
13:22:12   9   that the formula doesn't work.  I don't think we've seen
13:22:16  10   a single case where this formula inaccurately predicts
13:22:19  11   who the requester is.  And even a single case wouldn't
13:22:23  12   be enough to overcome probable cause, just probable
13:22:26  13   cause.  There is not a single article that undermines
13:22:30  14   the formula to make those predictions.  And, in fact, a
13:22:35  15   number of the articles that the defense themselves cited
13:22:40  16   explain ways in which Freenet does not operate in the
13:22:43  17   manner that its creators intended.
13:22:46  18           So, for example, if you look at the article
13:22:48  19   they submitted, "Measuring Freenet in the Wild," you can
13:22:52  20   show -- you can see that this article explains how
13:22:56  21   Freenet does not operate as quickly or as efficiently as
13:23:01  22   designed, and is not meeting its designers'
13:23:04  23   expectations.  And the exhibits long delays, frequent
13:23:08  24   routing factors, involve adequate user models to predict
13:23:16  25   activity.  They cited a trace back attack on Freenet.
```

```
          1              USA V. J. LOONEY
13:23:21  2   And this article says right in the article, "The
13:23:24  3   originating machine of a request message can be
13:23:30  4   identified."  And cites how the operation is different
13:23:33  5   than the theories that came up with by the developers,
13:23:36  6   and, therefore, does allow for routing.
13:23:39  7              Dr. Levine has tested this, that was in the
13:23:42  8   affidavit that Officer Turner submitted.  He has placed
13:23:46  9   it in practice.  And law enforcement has used it
13:23:48  10  throughout the country.  And there is not a single piece
13:23:51  11  of the evidence here that has been proffered here or
13:23:54  12  that would be offered at a hearing to undermine its
13:23:54  13  effectiveness or, more importantly, to show that
13:24:00  14  anything that Officer Turner put in his affidavit was
13:24:02  15  knowing or intentionally false.
13:24:05  16              MAGISTRATE JUDGE PEDERSEN:  So, is there a
13:24:07  17  question of fact about how Freenet operates that needs
13:24:12  18  to be explored?
13:24:13  19              MS. MCGUIRE:  Judge, I don't think there has
13:24:15  20  been any issue of fact or proffer of what proof will be
13:24:18  21  shown to show that Freenet operates in practice in any
13:24:22  22  way other than how the government has said it did.  If
13:24:25  23  the government went to a hearing, we would call Dr.
13:24:29  24  Levine.  He would say everything that I've just said.
13:24:32  25  Who would the defense call?
```

USA V. J. LOONEY

13:24:35  MAGISTRATE JUDGE PEDERSEN:  The New York
13:24:36  City case was *Corbett*, 20MAH669, that is the paper I
13:24:43  have.

13:24:44  MS. MCGUIRE:  That is the search warrant
13:24:48  magistrate number.

13:24:48  MAGISTRATE JUDGE PEDERSEN:  Yes.  And became
13:24:51  20CR525 in the Southern District.

13:24:55  MR. NAPIER:  Correct.

13:24:55  MAGISTRATE JUDGE PEDERSEN:  And has attached
13:24:57  a color printout called a "Freenet Target Summary."  And
13:25:01  in that --

13:25:06  MS. MCGUIRE:  No, I didn't have that.

13:25:07  MAGISTRATE JUDGE PEDERSEN:  It's contended
13:25:08  that law enforcement had more than one machine that was
13:25:12  connected to the suspect's machine.  And the number of
13:25:19  requests coming across are different, if I'm reading
13:25:25  this correctly.  But I don't understand what the
13:25:29  statistical test result is, Mr. Napier, where it says
13:25:34  "pass, pass, pass."

13:25:35  MS. MCGUIRE:  Your Honor, that means,
13:25:36  according to the formula, it's more likely than not that
13:25:39  the individual computer is requesting a file.

13:25:42  MR. NAPIER:  And, your Honor, I would note
13:25:44  that what they did there is that they took the greatest

```
  1                    USA V. J. LOONEY

  2   number of requests that any given connected FBI node

  3   received and indicated statistical test result "pass"

  4   when they were very different -- there were a very

  5   different number of requests, as the Court can easily

  6   see.  From 10 to 29 in the first file of interest.  From

  7   4 to 42 in the second file of interest.  And then from 5

  8   to 25 in the third file of interest.

  9            MS. MCGUIRE:  Although, your Honor, I would

 10   point out, when we say "even," we say "roughly even"

 11   every time, we're talking in factors of 10 and 100.

 12   We're talking about multiple divisions.  So, roughly

 13   even within a factor of 10, all of these would be

 14   roughly even when you're talking that large of a number.

 15            MR. NAPIER:  Your Honor, I would have to

 16   push back on that.  And in terms of total unique

 17   requests log and the first file of interest it says 76,

 18   and one FBI node received 29, one received 11, one

 19   received 10 and one received 17, that those are not

 20   close to roughly even.

 21            MS. MCGUIRE:  That is the total column.

 22            MR. NAPIER:  Right.  If I could just

 23   continue, please.

 24            MS. MCGUIRE:  I'm sorry.

 25            MR. NAPIER:  And then the total unique
```

                              USA V. J. LOONEY

13:27:12   2   request log in the file interest No. 42 was 46.  And law

13:27:17   3   enforcement received the two respective nodes received

13:27:22   4   42 and 4.  I'm sorry.  I don't see how there can be a

13:27:26   5   credible argument that those are roughly even number of

13:27:31   6   requests with the last one being total unique requests

13:27:35   7   log 78 and between 5, 12, 19 and 25.  I haven't done the

13:27:43   8   percentages on each of those numbers of request, but

13:27:46   9   they don't seem roughly evenly to me.

13:27:49   10          MS. MCGUIRE:  Again, when you're talking

13:27:51   11  about factors of 10, it is roughly even.  This is the

13:27:55   12  Levine formula accurately predicting there would be CP

13:27:58   13  at this location where this warrant was executed.  And I

13:28:01   14  also point out this warrant was signed almost two years

13:28:04   15  after Officer Turner's warrant, so I don't even see this

13:28:08   16  would be admissible or relevant in a suppression

13:28:12   17  hearing.

13:28:13   18          So, again, I just go back to, if we had a

13:28:16   19  hearing, the government would call Dr. Levine, and he

13:28:19   20  would say everything that we proffered.  Who or what

13:28:23   21  would the defense offer as rebuttal?  Because they are

13:28:28   22  only entitled to a hearing if there is sufficient

13:28:31   23  evidence of proof that they are going to proof put on

13:28:34   24  about.  What would that be?  What is the proof there.

13:28:37   25          MR. NAPIER:  I think as the Freenet, a core

```
            1                    USA V. J. LOONEY
13:28:39    2    part of the government's argument was that the Levine
13:28:42    3    method works was there was so-called 97 percent, 97
13:28:49    4    percent rate that of not being a false positive.  In
13:28:56    5    other words, that there was 2.3 percent of false
13:29:00    6    positives rate.  And, again, the Freenet developers in
13:29:03    7    their '22 argument, in the '22 article say that is a
13:29:09    8    wrong false positive rate.  The quoting from that
13:29:14    9    article, "The four pillars of the detection they name is
13:29:20   10    this claim of 2.3 percent false positive rate, but this
13:29:22   11    claim is wrong because they only reach it through many
13:29:25   12    false assumptions."
13:29:25   13            That is the factual dispute we're having
13:29:28   14    with the government regarding claims that were made
13:29:32   15    regarding 97 percent showing, and only a 2 percent
13:29:39   16    showing of a false positive rates that the article
13:29:42   17    continues, more technical in detail, they ignore the
13:29:46   18    friend-of-a-friend routing breaks their method when an
13:29:50   19    intermediary node or the observing node contains many
13:29:55   20    connections, which is not the rare case but the normal
13:29:57   21    case.  They assume they only get a false positive if the
13:30:00   22    request for a given file reached them with both HTL or
13:30:05   23    Hops 18 or HTL 16 and HTL 16 and HTL 17.  But the
13:30:11   24    routing algorithm causes them to almost always receive
13:30:15   25    requests from a given node over the same route.  So they
```

```
                            USA  V.  J.  LOONEY
```

1

13:30:15  2   will have the same HTL regardless of the number of hops

13:30:20  3   over a given node.

13:30:20  4           MAGISTRATE JUDGE PEDERSEN:  Mr. Napier, let

13:30:22  5   me interrupt you for a moment.

13:30:25  6           That?

13:30:26  7           MR. NAPIER:  Yes, that is included.  We did

13:30:29  8   send that.

13:30:30  9           MAGISTRATE JUDGE PEDERSEN:  What is the

13:30:31  10  source of this document entitled "How Freenet Works,"

13:30:34  11  and it starts out, "The affidavit by Officer Turner

13:30:37  12  describes."

13:30:38  13          MR. NAPIER:  Yes.  Yes.  Your Honor, that is

13:30:45  14  a document that I put together quoting, well, for

13:30:54  15  instance, quoting Dr. Brian Levine.  As far as in the

13:30:59  16  third paragraph of that document, he states, "When

13:31:02  17  sending a request, a node attempts to send it in the

13:31:06  18  direction of the node closest to the block's location.

13:31:08  19  Freenet performs friend-of-a-friend routing."  That is

13:31:14  20  their admitted expert who says that Freenet performs

13:31:23  21  friend-of-a-friend routing, which is not even share.

13:31:25  22          MS. MCGUIRE:  So, your Honor, this is a copy

13:31:27  23  and paste from a printout from the internet.  I don't

13:31:30  24  think the Court should give it any weight.  Is a Freenet

13:31:34  25  developer coming to testify to these allegations to say

                                USA V. J. LOONEY

13:31:37  2   we've tested the formula and it doesn't work?  We've

13:31:39  3   tested how Freenet actually operates and that is not how

13:31:43  4   it operated?  Is that what the defense is proposing for

13:31:47  5   a hearing?

13:31:48  6            MR. NAPIER:  Well, your Honor, we would

13:31:50  7   accept Dr. Levine testifying, I think the government had

13:31:53  8   proffered the possibility of having to produce Dr.

13:31:56  9   Levine, and cross examining Dr. Levine regarding things

13:32:01  10  that he has written to determine how Freenet operates.

13:32:08  11            MAGISTRATE JUDGE PEDERSEN:  So, you're

13:32:09  12  saying that Dr. Levine has undermined his own theory.

13:32:12  13            MR. NAPIER:  Well, I'm submitting, your

13:32:19  14  Honor, that Freenet, when Dr. Levine in both his 2017

13:32:22  15  and 2020 academic papers, states that "Freenet performs

13:32:30  16  friend-of-a-friend routing," that is a quote from both

13:32:32  17  of those papers, that that is contrary to the

13:32:36  18  government's affidavit which never refers to

13:32:40  19  "friend-of-a-friend routing" at any point in however

13:32:45  20  many pages that affidavit was.  And there are numerous

13:32:50  21  descriptions of even share routing in that affidavit.

13:32:58  22            MS. MCGUIRE:  Actually, your Honor, it

13:33:03  23  doesn't.  It says "roughly distributed evenly."

13:33:04  24            MR. NAPIER:  Right, which I believe to be

13:33:07  25  synonymous.

1          USA V. J. LOONEY

13:33:08  2          MAGISTRATE JUDGE PEDERSEN:  Okay.  Is there

13:33:11  3   an authority, someone who has experimented that has come

13:33:17  4   up with the conclusion that Dr. Levine's theory is

13:33:19  5   wrong?  I know that there is push back by the developers

13:33:25  6   of Freenet, but, as Ms. McGuire points out, there is

13:33:28  7   theory and then there is practical operation.  It

13:33:32  8   appears that Dr. Levine did his on the practical

13:33:38  9   operation.

13:33:39  10         MR. NAPIER:  Right.  Judge, I think what was

13:33:41  11  also -- I will come back to that, but, before I forgot,

13:33:46  12  I think, and this was also, I believe, submitted to the

13:33:50  13  Court as far as the formula that Dr. Levine created, and

13:33:58  14  the formula is referred to 18 different times, although

13:34:02  15  never shown in the affidavit as to what the formula was.

13:34:05  16  And the formula was, according to the Freenet

13:34:12  17  developers, the formula was changed in 2020.  This is

13:34:18  18  the formula that is apparently that is used to determine

13:34:21  19  who a downloader is.

13:34:23  20         And, Judge, nolo contendere, I don't

13:34:27  21  understand.  I show the formula to the Court is pretty

13:34:32  22  lengthy and I think submitted to the Court by us, but I

13:34:36  23  have no idea what it says, to be honest with you.  And

13:34:40  24  the government, although we refer to the formula, like

13:34:44  25  the Wizard of Oz, it is not described at all how it is

1                        USA V. J. LOONEY

13:34:49   2   that that formula determines who, more likely than not,

13:34:56   3   is the downloader of a particular file.

13:35:04   4           Judge, we would, albeit perhaps as late in

13:35:08   5   the day, but if the Court were to grant a hearing in

13:35:13   6   which the people would have, presumably, Dr. Levine

13:35:19   7   testify, we have been in contact with one of the

13:35:24   8   developers of Freenet, and there is a possibility that

13:35:28   9   we could produce that developer, who we believe would

13:35:34   10  say that, well, again, as Dr. Levine himself said, for

13:35:40   11  one thing, friend-of-a-friend routing is the way

13:35:43   12  requests are distributed.  And that it is not done

13:35:48   13  through even share, and, therefore, it's impossible to

13:35:55   14  determine an expected number of requests leading to

13:35:58   15  probable cause.

13:36:00   16          MS. MCGUIRE:  And just to clarify, Judge.  I

13:36:02   17  think we agree on his first point and diverge on the

13:36:06   18  second, right?  Friend-of-a-friend routing is the

13:36:08   19  design.  The question is whether or not Dr. Levine

13:36:10   20  created a model that accurately predicts how that design

13:36:14   21  works in practice.  And he designed the model, he tested

13:36:17   22  the model, he got a 98 percent positive rate, 2 percent

13:36:22   23  false positive rate.  And on top of that, law

13:36:25   24  enforcement has been using this model in practice

13:36:28   25  successfully throughout the country, and we have yet to

USA V. J. LOONEY

hear a single example of it not working.  We don't have
a single study saying this formula does not work.  We
don't have a single example of a time when it didn't
work.  All we have is maybe we'll call one of the
developers that will say, A, the thing we all agree on,
there was a specific way this was designed to work; and
then, B, it can't possibly predict who a requester is,
which we've already proven it's false because we do
predict who it is as in this case.

MR. NAPIER:  We are referring to the
methodology.  Quite frankly, I think this is the first
time I've heard the government say, I don't want to
misstate what you said, but that the method used to
distribute requests is friend-of-a-friend routing.
Again, that is not referred to at all in the affidavit.
The government is now saying, I believe the government
is saying Freenet does employ friend-of-a-friend
routing, but their even share model is valid in
determining who a downloader is.  And I submit, your
Honor, that that is a factual dispute that requires an
evidentiary hearing.

MS. MCGUIRE:  But what is the import of that
factual dispute?  The only question is whether or not
this methodology establishes probable cause.  The

```
                              USA V. J. LOONEY
```

13:38:03 2  question is whether or not this method, more likely than

13:38:06 3  not, predicts who a requester is.  And the only evidence

13:38:10 4  in front of the Court and even multiple chances to

13:38:14 5  proffer today, is that it does.  There is no issue of

13:38:18 6  fact.

13:38:18 7          And, on top of that, in light of *Leon*, there

13:38:21 8  is no way there will be ever any testimony that Officer

13:38:27 9  Turner had any reason to believe that this was anything

13:38:29 10 other than a reliable method of identifying a requester

13:38:37 11 of child pornography.

13:38:38 12         MR. NAPIER:  And, Judge, that may be the

13:38:40 13 case, but we don't know that to be true in terms of

13:38:43 14 Officer Turner's basis for knowledge.  The *Franks* case

13:38:49 15 does talk about reckless disregard for the truth.  And

13:38:52 16 we say that Levine himself says that requests are

13:38:56 17 distributed by way of friend-of-a-friend routing both in

13:38:59 18 2017 and in 2020, that, well, quite frankly, I think

13:39:05 19 that that is something that Officer Turner should have

13:39:07 20 been aware of.  And if he was aware of it, why didn't he

13:39:13 21 refer to that in the affidavit?

13:39:16 22         MS. MCGUIRE:  Your Honor, that is pure

13:39:18 23 speculation and speculation is not the basis for a

13:39:21 24 *Franks* hearing.  And, again, I feel like we're talking

13:39:24 25 in circles.  No one is disagreeing with how the

```
                              USA V. J. LOONEY
13:39:29   2   designers hoped things would work.  But the affidavit
13:39:32   3   doesn't talk about the design intentions.  It talks
13:39:36   4   about how things work in practice on the network and
13:39:38   5   ways you can use to predict who a user is.  And they are
13:39:43   6   completely different things.  And the former was not
13:39:45   7   brought up in the affidavit, only the latter.  How that
13:39:48   8   network works in a practice and how this formula is used
13:39:52   9   to predict the requester.
13:39:52  10           MR. NAPIER:  Judge, if I may, how it works
13:39:54  11   in practice, there is the New York City case, and I
13:39:56  12   heard the government say that they believe the New York
13:39:59  13   City case with those numbers and assuming they are
13:40:02  14   accurate as far as the requests received, that those are
13:40:07  15   roughly evenly distributed.  And they clearly, to me, do
13:40:13  16   not appear to be roughly evenly distributed.
13:40:17  17           MAGISTRATE JUDGE PEDERSEN:  They also said
13:40:19  18   they were roughly even if you looked at it in a factor
13:40:23  19   of 10.
13:40:24  20           MS. MCGUIRE:  And the numbers were placed in
13:40:26  21   the formula.  The formula said this is probably a
13:40:29  22   requester, that is why the search warrant was occurred
13:40:35  23   and they ultimately found child pornography.
13:40:37  24           MR. NAPIER:  But, again, how it works
13:40:38  25   practically, if the only law enforcement node connected
```

1                    USA V. J. LOONEY

13:40:40  2    was the one that was received in any particular file,

13:40:45  3    they would not have had a basis to get a warrant in that

13:40:49  4    particular case.  As far as how it works practically,

13:40:53  5    I'm repeating myself now, Judge, if that was the only

13:40:57  6    law enforcement node connected, I would submit, under

13:41:01  7    their own model, they would not be able to justify a

13:41:04  8    warrant being issued because they would not have

13:41:07  9    probable cause under -- given that they expected to

13:41:11  10   receive so many more requests if this was the

13:41:15  11   downloader.

13:41:16  12          MS. MCGUIRE:  Right.  That is the formula.

13:41:18  13          MAGISTRATE JUDGE PEDERSEN:  I appreciate

13:41:19  14   that.  And I'm glad I don't have to decide that

13:41:21  15   particular issue.  In this case, there was one police

13:41:24  16   node connected, correct?

13:41:26  17          MS. MCGUIRE:  Yes.

13:41:28  18          MAGISTRATE JUDGE PEDERSEN:  It says "open

13:41:28  19   share."  And based on the requests that node received in

13:41:32  20   applying the formula Dr. Levine posited, they predicted

13:41:40  21   that the requester was Mr. Looney.

13:41:42  22          MS. MCGUIRE:  That's correct.

13:41:43  23          MAGISTRATE JUDGE PEDERSEN:  Okay.  Is there

13:41:44  24   some evidence, some affidavit, some peer reviewed paper

13:41:53  25   that tells me the method used for this particular case

1                    USA V. J. LOONEY

13:42:00   2   was inaccurate, could not have predicted the outcome

13:42:04   3   here?  I'm trying to see if there is an issue of fact

13:42:10   4   that has been brought to my attention that requires a

13:42:13   5   hearing.  I could ask for a hearing, but if all we have

13:42:17   6   is the government bringing in Dr. Levine and cross

13:42:21   7   examining Dr. Levine, I don't see where we have two

13:42:24   8   sides against the middle.  But are you saying that it's

13:42:28   9   enough just to cross examine the government's witness?

13:42:34   10           MR. NAPIER:  I think it may be, your Honor.

13:42:37   11   Again, we submit to you that the formula as the Freenet

13:42:43   12   developers maintain and the method used by Dr. Levine is

13:42:52   13   not how requests are distributed; that it's a false

13:42:56   14   method.

13:42:57   15           MAGISTRATE JUDGE PEDERSEN:  Right.  But you

13:42:59   16   have not done any experimentation yourself to make that

13:43:04   17   conclusion.

13:43:04   18           MR. NAPIER:  True, true.

13:43:06   19           MAGISTRATE JUDGE PEDERSEN:  You're basing

13:43:06   20   that on what?

13:43:11   21           MR. NAPIER:  Well, we're basing it on --

13:43:19   22   we're not aware of anyone, other than Levine himself,

13:43:26   23   saying, and in the government's affidavit saying that

13:43:30   24   requests are distributed roughly evenly, and that even

13:43:35   25   share can be used as a valid method for determining who

1                      USA V. J. LOONEY

13:43:40    2    a downloader is other than Levine himself.  And I

13:43:49    3    submit, your Honor, given the contradiction, as far as

13:43:54    4    how requests are actually distributed, that that calls

13:44:01    5    for an evidentiary hearing.

13:44:03    6                    MAGISTRATE JUDGE PEDERSEN:  What if Dr.

13:44:05    7    Levine came in here and testified, yeah, I know Freenet

13:44:08    8    was designed to make the identification of the requester

13:44:13    9    impossible to learn, but my experiment shows that is not

13:44:19   10    the case.  And even with the current method it uses for

13:44:24   11    routing requests, my formula still works.

13:44:27   12                    You could cross examine him over and over

13:44:29   13    again, but who would you have to contradict him other

13:44:33   14    than your own suppositions?

13:44:35   15                    MR. NAPIER:  Well, your Honor, I would like

13:44:37   16    an opportunity to see if a Freenet developer could

13:44:41   17    testify regarding, in support of, basically, if they

13:44:46   18    were a Freenet developer were to say what was said in

13:44:51   19    their recent article, "The Freenet Project Inc" is the

13:44:56   20    website and for the Freenet developers, that say that

13:45:02   21    the core pillar of their detection they name is a claim

13:45:07   22    of 2.3 false positive rate, but this claim is wrong

13:45:11   23    because they only reach it through many false

13:45:14   24    assumptions.  In other words, that their so-called

13:45:17   25    verification statistic is inaccurate because it makes

1                           USA V. J. LOONEY

13:45:26   2   false assumptions.  And I would like an opportunity to

13:45:31   3   present a witness to testify to that.

13:45:39   4                   MAGISTRATE JUDGE PEDERSEN:  But I've gotten

13:45:53   5   the impression that there is no other person besides Dr.

13:45:58   6   Levine from which you've actually argued who has

13:46:02   7   actually gotten into the nuts and bolts of the machine

13:46:06   8   to make this assertion that, no, it doesn't operate in a

13:46:10   9   way that makes it impossible to determine who the

13:46:13   10  requester is.

13:46:13   11                  MR. NAPIER:  That may be true, your Honor.

13:46:19   12  But, as stated, we believe that there is academic papers

13:46:25   13  that have been peer reviewed and have been submitted to

13:46:29   14  the Court, and the Freenet developers themselves that

13:46:33   15  say this is not the method used by -- that it's a false

13:46:37   16  method used to determine who a downloader is.

13:46:41   17                  MAGISTRATE JUDGE PEDERSEN:  So, if there

13:46:43   18  were false positives --

13:46:44   19                  MR. NAPIER:  And, quite frankly -- I'm sorry

13:46:46   20  to interrupt the Court.  Quite frankly, I'm not aware of

13:46:49   21  an academic paper saying that the Levine approach is

13:46:56   22  valid as far as even share or that requests were

13:47:00   23  distributed roughly evenly.  I'm aware of several that

13:47:04   24  say that that is not the methodology.

13:47:08   25                  MAGISTRATE JUDGE PEDERSEN:  When you say

USA V. J. LOONEY

13:47:09   2  there are several attesting that that is not the

13:47:14   3  methodology, do you mean they have experimented as it

13:47:19   4  appears Dr. Levine has to make that determination or are

13:47:22   5  they basing that on the developer's assertions that this

13:47:28   6  is how we designed it?

13:47:35   7          MR. NAPIER:  You know what, your Honor, I

13:47:38   8  believe that we could show through academic papers that

13:47:41   9  they have experimented and that this method, so-called

13:47:47   10 Levine method or even share is false.

13:47:49   11         MS. MCGUIRE:  I would ask which one, your

13:47:52   12 Honor, because I've read them all and none of them

13:47:54   13 falsify the Levine method, which, in contrast, that is

13:47:58   14 in an academic peer reviewed paper, published not once,

13:48:03   15 but twice, once in 2017 and 2020.  I have read all of

13:48:05   16 these and not a single one of them said, we tested the

13:48:09   17 Levine method and it doesn't work.  Four or five of them

13:48:09   18 say we also found ways you could detect downloaders.  A

13:48:09   19 couple of them are by the developers when they were in

13:48:09   20 their initial developer stage talking theoretically

13:48:16   21 talking about how they wanted the network to work.  But

13:48:18   22 not one of them says we tested the Levine formula and it

13:48:22   23 doesn't work.

13:48:36   24         MR. NAPIER:  I'm sorry, your Honor.  If I

13:48:38   25 can clarify that.  It's my understanding that these

1                    USA V. J. LOONEY

13:48:41   2   experts tested how Freenet worked, but not directly

13:48:46   3   testing the Levine method.  Again, it's just that these

13:48:51   4   experts tested how Freenet works and not directly of

13:49:02   5   whether the Levine method works.

13:49:04   6              MS. MCGUIRE:  And I would submit how Freenet

13:49:09   7   works, there is a paper that says how it does not work

13:49:12   8   based on design, again, on the Levine method.

13:49:16   9              MAGISTRATE JUDGE PEDERSEN:  Even if we had

13:49:17  10   an expert in that says, here is how Freenet works and

13:49:21  11   it's different than how Dr. Levine works, then you would

13:49:25  12   ask me to conclude, based on that expert testimony, that

13:49:28  13   Dr. Levine's method is false.  But I don't have the

13:49:32  14   technical expertise to ascertain that.

13:49:36  15              MR. NAPIER:  I understand that, your Honor.

13:49:37  16   And I suppose, you know, I just fall back on the New

13:49:43  17   York City case.  And those, you know, and the three out

13:49:47  18   of the four cases where the FBI noted it was monitoring

13:49:52  19   a file of interest, a suspected downloader.  I submit

13:49:56  20   under their own numbers, they don't have a probable

13:49:59  21   cause for a search warrant to issue because they were so

13:50:03  22   substantially less than the suspected number of

13:50:06  23   requests.

13:50:06  24              MAGISTRATE JUDGE PEDERSEN:  Then how did

13:50:07  25   they get past the magistrate judge and the district

1          USA V. J. LOONEY

13:50:12   2   judge?

13:50:12   3          MR. NAPIER:  Because they went with the

13:50:13   4   highest number.  And the only thing referred to in the

13:50:16   5   affidavit was the FBI node that used the biggest number

13:50:22   6   in support of their position that there was probable

13:50:24   7   cause.  And, you know, so, again, obviously, we're just,

13:50:28   8   Mr. Looney and I are just left to guess as to if there

13:50:31   9   were other connected FBI nodes, the government

13:50:36  10   represents, I didn't know, quite frankly, until today,

13:50:40  11   that that was the only FBI node connected to Mr. Looney

13:50:47  12   as represented by the government.  But, again, that

13:50:51  13   didn't seem fair to me, Judge, but it kind of basically,

13:50:55  14   as far as in that New York City case, that they just

13:50:58  15   used the highest number when everything else is the

13:51:02  16   same.  These are connected nodes, directly connected,

13:51:04  17   with a suspected downloader to the FBI, very different

13:51:08  18   numbers of requests.  And I submit, we say this in one

13:51:14  19   submission to the Court that that was a 75 percent false

13:51:18  20   positive rate.  In other words, that 75 percent of the

13:51:22  21   cases would not have risen to the level of over the

13:51:28  22   expected number of requests leading to a conclusion of

13:51:33  23   probable cause that this person was the downloader.

13:51:37  24   Seventy five percent of the connected nodes of the FBI

13:51:43  25   would have led to the conclusion that this person was

USA V. J. LOONEY

13:51:46   2   not the downloader of that respective file of interest.

13:51:54   3             MAGISTRATE JUDGE PEDERSEN:  I assume that

13:51:56   4   chart was given to the magistrate judge in the Southern

13:52:10   5   District?

13:52:10   6             MR. NAPIER:  Your Honor, it had, as sent to

13:52:17   7   the Court, the U.S. Attorney office Bates stamp number

13:52:21   8   34.  And I think that the search warrant affidavit ended

13:52:27   9   in 33.  So, we don't have it attached, other than the

13:52:31   10  circumstantial evidence, if you will, your Honor, that

13:52:36   11  it was the 34th page of the warrant affidavit.

13:52:42   12            MS. MCGUIRE:  And, your Honor, that is why I

13:52:43   13  said I have no way of authenticating this.  I'm guessing

13:52:49   14  this is something that the defendant found online.

13:52:51   15  There are large communities of people who are Freenet

13:52:56   16  users who are flabbergasted by the fact that the

13:53:01   17  government can find child pornography on their computers

13:53:03   18  even though they are using this.  And so they started

13:53:05   19  these hubs where they exchange theories.  And I have no

13:53:11   20  way of authenticating and I can't tell the Court if it's

13:53:11   21  genuine.

13:53:12   22            MR. NAPIER:  It has a Bates stamp on the

13:53:14   23  bottom.  And, again, that does not answer the question.

13:53:16   24  But, it does, correct?

13:53:20   25            MS. MCGUIRE:  It does have a Bates stamp.

USA V. J. LOONEY

13:53:23  2      MAGISTRATE JUDGE PEDERSEN:  I can add a

13:53:24  3  Bates stamp to anything.

13:53:26  4      MR. NAPIER:  And as I say, your Honor, the

13:53:28  5  affidavit matches -- the IP address referred in the

13:53:32  6  affidavit of the Corbett case matches the IP address

13:53:37  7  referred to in this chart.

13:53:39  8      MAGISTRATE JUDGE PEDERSEN:  Then it does beg

13:53:41  9  the question, how the magistrate interpreted it to

13:53:44  10  believe there was probable cause.

13:53:45  11      MR. NAPIER:  But, again, your Honor, I think

13:53:47  12  very unfairly, the affidavit itself just referred to the

13:53:51  13  biggest number.  And, perhaps, the magistrate did not go

13:53:55  14  further than the biggest number in his determination

13:53:59  15  that there was probable cause for a search warrant.

13:54:05  16      MS. MCGUIRE:  Your Honor, I would have to

13:54:07  17  say I would object to the Court placing any

13:54:09  18  consideration on this given we have no idea what its

13:54:13  19  source is.

13:54:17  20      MR. NAPIER:  Your Honor, I think, you know,

13:54:21  21  I think we could certainly give more clarification to

13:54:26  22  this case.  There is no question in my mind that this

13:54:29  23  chart was connected to the *U.S. v. Corbett* case.  And I

13:54:35  24  believe through the -- even though we obtained it

13:54:38  25  separately, I believe that the -- it was included as an

```
                           USA V. J. LOONEY
```

13:54:42  2  attachment to the search warrant affidavit.  But, you

13:54:47  3  know, I could certainly provide more clarification to

13:54:51  4  the Court regarding that.  And I understand the issue

13:54:56  5  there, but I certainly believe it to be used in this

13:55:02  6  *U.S. v Corbett* case.

13:55:04  7          MAGISTRATE JUDGE PEDERSEN:  I would assume

13:55:05  8  had the magistrate judge read the application and seen

13:55:07  9  that attachment, that she would have questioned the

13:55:13  10  officer on that and its significance.  So I'm guessing

13:55:19  11  she was never shown it and why, I don't know.  And how

13:55:21  12  it came into your hands, I don't know.

13:55:28  13          MR. NAPIER:  Your Honor, if I may, that was

13:55:30  14  a fellow defense attorney provided the affidavit and who

13:55:35  15  is doing a similar case that provided the affidavit and

13:55:39  16  the chart.

13:55:41  17          MAGISTRATE JUDGE PEDERSEN:  Okay.

13:55:43  18          MR. NAPIER:  As separate documents.

13:55:48  19          MAGISTRATE JUDGE PEDERSEN:  Okay.  So, you

13:55:58  20  know, when people move to suppress evidence seized from

13:56:01  21  a house generally or from a car, we ask for an affidavit

13:56:06  22  of standing.

13:56:07  23          MR. NAPIER:  Yes.

13:56:08  24          MAGISTRATE JUDGE PEDERSEN:  In this case

13:56:09  25  here, I would like something from the defense to show

USA V. J. LOONEY

1

13:56:12  2    that there is an issue of fact that requires an

13:56:15  3    evidentiary hearing, because, right now, I don't see

13:56:18  4    that.  If you would like to submit something.

13:56:22  5              MR. NAPIER:  I appreciate the opportunity,

13:56:24  6    your Honor.

13:56:24  7              MAGISTRATE JUDGE PEDERSEN:  Can you do it in

13:56:26  8    a week?

13:56:26  9              MR. NAPIER:  I can.

13:56:27  10             MAGISTRATE JUDGE PEDERSEN:  And, Ms.

13:56:29  11   McGuire, can you respond within a week?

13:56:30  12             MS. MCGUIRE:  Yes.

13:56:31  13             MAGISTRATE JUDGE PEDERSEN:  Okay.  If I

13:56:33  14   determine that there is an issue of fact that needs to

13:56:36  15   have a hearing for its resolution, then I'll schedule a

13:56:39  16   hearing.  Otherwise, I'll issue a Report and

13:56:42  17   Recommendation to the district judge.

13:56:45  18             MR. NAPIER:  Thank you.  Your Honor, I would

13:56:46  19   request, if the government would agree, to briefly

13:56:52  20   respond to the government's reply to our request for

13:56:58  21   suppression under the privacy act.

13:57:02  22             MAGISTRATE JUDGE PEDERSEN:  Certainly.

13:57:02  23             MR. NAPIER:  Privacy act issues and in lieu

13:57:05  24   of oral argument on that motion.

13:57:10  25             MAGISTRATE JUDGE PEDERSEN:  I thought it was

```
            1              USA V. J. LOONEY
13:57:11    2    the government's contention that because this is an open
13:57:15    3    system, anybody can eavesdrop, if you will, without the
13:57:19    4    need for an eavesdropping warrant.  Is that what we're
13:57:24    5    talking about?
13:57:25    6              MR. NAPIER:  Yes, your Honor.
13:57:26    7              MS. MCGUIRE:  Not quite the government's
13:57:27    8    position.  There is an exception in any kind of a
13:57:28    9    eavesdropping statute where one of the parties consents,
13:57:31   10    this was an undercover, therefore, it's not
13:57:35   11    eavesdropping.  It would be like doing a controlled
13:57:40   12    phone call with an undercover on the under end, that is
13:57:41   13    traditionally not eavesdropping.
13:57:41   14              MAGISTRATE JUDGE PEDERSEN:  And that applies
13:57:42   15    no matter what state we're talking about.
13:57:44   16              MS. MCGUIRE:  I don't have an objection to
13:57:47   17    reply.  I ask that we adhere to the page numbers.
13:57:50   18              MR. NAPIER:  I didn't hear you.
13:57:51   19              MS. MCGUIRE:  I have no objection to a
13:57:54   20    reply.  I ask that we stick with the Court's page
13:57:59   21    numbers.
13:58:00   22              MR. NAPIER:  And how much is that?
13:58:01   23              MS. MCGUIRE:  I think it's 15.
13:58:02   24              MR. NAPIER:  Certainly, Judge.  I was
13:58:05   25    planning on perhaps a three or four page written
```

                           USA  V.  J.  LOONEY

13:58:08   2   response to the government's reply regarding that

13:58:10   3   particular motion.

13:58:11   4              MS. MCGUIRE:  No objection.

13:58:12   5              MAGISTRATE JUDGE PEDERSEN:  You didn't want

13:58:13   6   to raise that now.

13:58:14   7              MR. NAPIER:  If I could submit that in

13:58:16   8   writing, I appreciate it.

13:58:18   9              MAGISTRATE JUDGE PEDERSEN:  Same time table?

13:58:19  10              MR. NAPIER:  Same time table is fine.

13:58:21  11              MAGISTRATE JUDGE PEDERSEN:  I'm going to get

13:58:24  12   something from you.  There is an issue of fact and

13:58:26  13   something from you responding to the Government's

13:58:31  14   contention this eavesdropper had permission because he

13:58:34  15   consented.

13:58:35  16              MR. NAPIER:  Yes, your Honor.  Thank you.

13:58:36  17   Within a week.

13:58:37  18              MAGISTRATE JUDGE PEDERSEN:  Very good.

13:58:37  19              MR. NAPIER:  And, your Honor, is your Honor

13:58:39  20   going to give us another court date?  I'll submit within

13:58:44  21   a week.

13:58:45  22              MAGISTRATE JUDGE PEDERSEN:  Right.  And Ms.

13:58:47  23   McGuire is going to submit within a week of your

13:58:49  24   submission.  After which time I'll either set a date for

13:58:52  25   a hearing or I'll issue a Report and Recommendation.

```
      1                      USA V. J. LOONEY
13:58:56  2            MR. NAPIER:  Very well.
13:58:57  3            MAGISTRATE JUDGE PEDERSEN:  So, the time is
13:58:58  4   still excluded under the Speedy Trial Act because there
13:59:03  5   is a motion pending.  We're still getting information on
13:59:05  6   that motion to be able to resolve it.  And if we have a
13:59:08  7   hearing, that will extend things further.  When I issue
13:59:12  8   the Report and Recommendation, if I do, that then you'll
13:59:15  9   know we're not having a hearing and I should know within
13:59:18  10  a week or so of, yes, I need a hearing or, no, I don't.
13:59:22  11           MR. NAPIER:  Understood.  Thank you very
13:59:24  12  much.
13:59:25  13           Thank you, Ms. McGuire.
          14           MS. MCGUIRE:  Thank you.
          15                      *    *    *
          16            CERTIFICATE OF REPORTER
          17     I certify that the foregoing is a correct transcript
          18  of the record to the best of my ability of proceedings
          19  transcribed from the audio in the above-entitled matter.
          20
          21  S/ Karen J. Clark,  RPR
          22  Official Court Reporter
          23
          24
          25
```